UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| MICHELLE JENKINS, on behalf of herself and others similarly situated, | : <br> : CIVIL ACTION FILE NO. 0:20-cv-02337-MGL |
| Plaintiff, | : <br> : |
| v. | : <br> : <br> : **FIRST AMENDED COMPLAINT –** |
| PANDORA MARKETING, LLC d/b/a "TIMESHARE COMPLIANCE" and JARED'S LEADS, INC., | : **CLASS ACTION** <br> : <br> : <br> : **JURY TRIAL DEMANDED** |
| Defendants. | : |

Plaintiff Michelle Jenkins (hereinafter referred to as "Plaintiff" or "Ms. Jenkins"), individually and on behalf of all others similarly situated, allege on personal knowledge, investigation of her counsel, and on information and belief, as follows:

**PRELIMINARY STATEMENT**

1.      Ms. Jenkins brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs.*, *LLC,* 132 S. Ct. 740, 745 (2012).

2.      Ms. Jenkins alleges that Defendants Pandora Marketing, LLC ("Pandora Marketing") and Jared's Leads, Inc. ("Jared's Leads") (collectively "Defendants") collaborated to send her unsolicited telemarketing calls without prior express written consent in an attempt to persuade Ms. Jenkins into enlisting the services of Pandora Marketing to eliminate Ms. Jenkins' timeshare obligations.

3. Upon information and belief, the calls to Ms. Jenkins were dialed by Jared's Leads, Inc.

4. Because these calls were transmitted using technology capable of generating thousands of similar calls per day, Ms. Jenkins sues on behalf of a proposed nationwide class of other persons who received similar calls.

5. A class action is the best means of obtaining redress for the Defendants' illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

## **NATURE OF ACTION**

### The Telephone Consumer Protection Act

6. Even as far back as 2012, the Pew Research Center reported 69 percent of cellular users who use text messaging receive unwanted text message spam, with 25 percent of them receiving it on a weekly basis. Jan Lauren Boyles and Lee Rainie, *Mobile Phone Problems*, Pew Research Center (Aug. 2, 2012), http://www.pewinternet.org/2012/08/02/mobile-phone-problems.

7. Robocalls, including automated calls have only increased since the 2012 study. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC Chairman).

8. "The FTC receives more complaints about unwanted calls than all other complaints combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the TCPA of 1991, Notice of*

*Proposed Rulemaking*, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016), *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf.

Summary of Plaintiff's Allegations

9. This case involves campaigns by Pandora Marketing and Jared's Leads to market a variety of services through the use of automated telemarketing calls in plain violation of the TCPA.

10. Pandora Marketing has a relationship with third-party telemarketers, including Jared's Leads, who make or hire others to make automated calls for Pandora Marketing and other companies.

11. Moreover, the vendors used by Pandora Marketing, including Jared's Leads, send multiple calls to cellular and residential telephone numbers that are registered on the National Do Not Call List (hereafter "NDNC"), which is a separate and additional violation of the TCPA. The recipients of these illegal calls, which include Plaintiff and the proposed classes, are entitled to damages under the TCPA.

**PARTIES**

12. Plaintiff Michelle Jenkins is, and at all times mentioned herein was, an individual citizen of South Carolina.

13. Defendant Pandora Marketing, LLC is a Wyoming limited liability company, with a principal place of business of 26970 Aliso Viejo Parkway, Suite 150 in Aliso Viejo, California 92656 and a registered agent of William Wilson at the same address.

14.     Defendant Pandora Marketing, LLC was formally known as Timeshare Compliance LLC. See Exhibit A. Upon information and belief, Pandora Marketing, LLC continues to do business and represent itself to the public as "Timeshare Compliance."

15.     Defendant Jared's Leads, Inc. is a California corporation with a principal place of business of 30765 Pacific Coast Highway, Number 241, in Malibu, California and a registered agent of Jared Knapp at 5184 Benedict Court, Oak Park, California 91337. Defendant Jared's Leads, Inc.  is a telemarketing vendor utilized by the Pandora Marketing.

16.     Defendants are each a "person" as the term is defined by 47 U.S.C. § 153(39).

## JURISDICTION AND VENUE

17.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227 *et seq*.

18.     This Court has personal specific jurisdiction over Jared's Leads, Inc. because the company contracted with Pandora Marketing, LLC to make calls to individuals in this District.

19.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the illegal telemarketing calls that are the subject of this putative class action lawsuit were made into this District to consumers living in this District.

## TCPA BACKGROUND

Calls Made Using an "Automated Telephone Dialing System"

20.     The TCPA regulates, among other things, the use of a pre-recorded message or an automated telephone dialing system ("ATDS") to make calls or send automated calls.  *See* 47 U.S.C. § 227, *et seq.*; *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

21.     Specifically, the TCPA prohibits the use of an automated telephone dialing system to make any telemarketing call or send any telemarketing text message to a wireless number in the absence of an emergency or the prior express written consent of the called party. *See* 47 U.S.C. § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(a)(2); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1831 (F.C.C. 2012).

22.     The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." § 227(a)(1)(A)-(B).  The first component of this definition is satisfied when a dialing system has the capacity to call "a given set of numbers" or when "dialing equipment is paired with . . . a database of numbers."  *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14,014, ¶ 133 (2003); *see In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 566 (F.C.C. 2008) (rejecting argument that a dialing system "meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists" and reasoning that "the teleservices industry had progressed to the point where dialing lists of numbers was far more cost effective"); *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1051 (9th Cir. 2018) (holding that "equipment that made automatic calls from lists of recipients was . . . covered by the TCPA").

23. "[T]elemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12).

24. "[P]rior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(8).

The National Do Not Call Registry

25. Second, § 227(c) of the TCPA requires the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

26. In this rulemaking proceeding, the FCC was instructed to "compare and evaluate alternative methods and procedures and "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish purposes of this section." *Id.* at (c)(1)(A), (E).

27. Pursuant to this statutory mandate, the FCC issued two regulations, only one of which is relevant here.

28. The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

6

29. A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id*.

30. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

## FACTUAL ALLEGATIONS

31. Pandora Marketing advertises itself as being a "full-service advocacy group helping clients [] legally and successfully exit timeshare contracts." *See*, https://timesharecompliance.com/ (last accessed August 19, 2020).

32. As part of its marketing efforts, Pandora Marketing enlists this assistance of third parties to scour a variety of public and private records to create expansive lists of potential timeshare owners for it to attempt to solicit business.

33. One of these third-party companies is Jared's Leads. Jared's Leads provides Pandora Marketing and other companies with a variety of telemarketing services, including the use of automatic telephone dialing systems.

### Calls to Plaintiff

34. At no point has Ms. Jenkins sought out or solicited information regarding the timeshare related services purported provided by Pandora Marketing, LLC.

35. Ms. Jenkins' telephone number, XXX-XXX-7515, is registered to a cellular telephone service (hereinafter the "Cellphone Number").

36. On September 29, 2012, Ms. Jenkins' Cellphone Number was registered with the National Do Not Call Registry. See Exhibit B.

37. Ms. Jenkins has received several telemarketing calls promoting the timeshare related services provided by Pandora Marketing.

38. One such call occurred on February 25, 2020.

39. Unlike on a normal call, no one promptly announced themselves to Ms. Jenkins when she answered the phone. Instead, Plaintiff heard several unnatural clicks and a lengthy pause between Ms. Jenkins answering "hello" and a representative finally responding.

40. Ms. Jenkins said "hello" three (3) separate times prior to a representative finally responding.

41. The pause signifies the algorithm of the predictive dialer operating. The predictive dialer dials thousands of numbers at once, and only transfers the call to a live agent once a human being is on the line.

42. The dialing system used by Jared's Leads on behalf of Pandora Marketing also has the capacity to store telephone numbers in a database and dial them automatically with no human intervention.

43. Loading a list of telephone numbers into the dialing system and pressing a single command does this.

44. As a predictive dialer, the dialing system can also produce numbers using a sequential number generator and dial them automatically.

45. The dialing system can do this by inputting a straightforward computer command.

46. Following that command, the dialing system will sequentially dial numbers.

47.     First, it would dial a number such as (555) 000-0001, then (555) 000-0002, and so on.

48.     This would be done without any human intervention or further effort.

49.     The autodialed telephone calls from Jared's Leads on behalf of Pandora Marketing and other third-party companies include telephone number (619) 693-1204.

50.     The system that sent automated calls to Ms. Jenkins qualifies as an ATDS pursuant to 47 U.S.C. 227(a)(1)(A).

51.     Eventually a representative answered and said "Hello, Michelle?" Ms. Jenkins said "yes." The representative then asked Ms. Jenkins if she still owned her timeshare. Ms. Jenkins confirmed that she did and the representative said hold on, and eventually transferred the call to another representative.

52.     When the call connected with the second live representative, Ms. Jenkins attempted to ascertain the identity of the caller.

53.     The second representative provided his name as "John Garcia." Ms. Jenkins asked who the previous representative was and was told he was "Tony."

54.     Ms. Jenkins expressed her concern about the call and "John Garcia" assured her that the company he was calling from was not a scam. "John Garcia" provided her with his company's information, including the website, https://timesharecompliance.com/, and his telephone number, (949) 336-3723. Ms. Jenkins confirmed that she was content with her timeshare and was not interested in eliminating any such obligations.

55.     After getting off the phone with "John Garcia," she visited the website that was provided and called the number that was listed; 1-800-705-6856. Ms. Jenkins wanted to

9

determine if "John Garcia" and "Tony" were scammers pretending to be associated with Pandora Marketing, LLC or Timeshare Compliance, LLC. A female representative answered the phone and Ms. Jenkins asked to speak to "John Garcia." This representative said there was nobody with her organization by that name but there was a "John Bridges."

56. Ms. Jenkins explained that somebody called her representing themselves as working for "Timeshare Compliance." This agent eventually communicated to Ms. Jenkins that her company could help her extinguish her timeshare obligations. Michelle again confirmed she was not interested.

57. Shortly after getting off the phone with this representative, Ms. Jenkins received a call from "John Garcia" who explained to Ms. Jenkins that he was told that she was attempting to reach him. This telephone call made by "John Garcia" utilized telephone number (949) 336-3723.

58. During this call, "John Garcia" again confirmed that he worked for "Timeshare Compliance." Even though Ms. Jenkins confirmed she was not unfairly pressured or influenced into purchasing her timeshare, "John Garcia" scheduled her for another call with "John Bridges" the following day.

59. The next day, February 26, 2020, "John Bridges" called her using telephone number (949) 608-9641.

60. During this call, Ms. Jenkins again confirmed she was not interested in getting rid of her timeshare, but was interested in determining how Defendants obtained her contact information. "John Bridges" stated that it was "public information." Ms. Jenkins confirmed, again, that she was not interested in their services.

10

61. The next, February 27, 2020, Ms. Jenkins sent a written letter to Pandora Marketing, LLC, d/b/a Timeshare Compliance to 26970 Aliso Viejo Parkway, Suite 150, Aliso Viejo, California, 92656 confirming that the telephone calls made to her Cellphone Number were unwanted and were made without prior express consent.

62. On March 10, 2020, "Catherine Tan" emailed Ms. Jenkins from email address "catherine@tscompliance.com" "to confirm that we have received your letter RE: Illegal Calls." "Catherine Tan" also confirmed that her letter was forwarded to "our company's legal counsel, to proceed immediately with inquiries into the complaint."

63. Notwithstanding confirmation that the letter was received by Pandora Marketing, Ms. Jenkins received another autodialed promotional call to her Cellphone Number on March 18, 2020 from telephone number (619) 693-1204.

64. The calls received by Ms. Jenkins were sent for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services as it seeks to have her sign up and enter into a contract for the services of Pandora Marketing. This message therefore qualified as telemarketing. 47 C.F.R. § 64.1200(f)(12).

65. Moreover, the Cellphone Number was on the National Do Not Call Registry for more than 31 days prior to the receipt of the first call advertising Pandora Marketing's goods or services. In fact, Ms. Jenkins' Cellphone Number has been listed on the registry since 2012.

66. The Cellphone Number is used exclusively for residential, non-commercial purposes.

67. At no point has Ms. Jenkins sought out or solicited information regarding Defendants' services.

68. The calls were not necessitated by an emergency.

69. Plaintiff and all members of the Class, defined below, have been harmed by the acts of Defendants because their privacy has been violated, they were annoyed and harassed, and, in some instances, they were charged for incoming calls. Plaintiff and the Class Members were also harmed by use of their cell phone battery and the intrusion on their cellular telephone that occupied it from receiving legitimate communications.

### **PANDORA MARKETING'S VICARIOUS LIABILITY**

70. For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

71. In its January 4, 2008 ruling, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations. *Id.* (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

72. In fact, the Federal Communication Commission has instructed that sellers such as Pandora Marketing may not avoid liability by outsourcing telemarketing to third parties, such as Jared's Leads:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law

enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

73. On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers."[1]

74. Pandora Marketing is liable for the telemarketing calls made by the telemarketing vendors they hire.

75. Pandora Marketing could have restricted Jared's Leads from using automated telemarketing, but they refused to do so.

76. Pandora Marketing accepted the benefits of Jared's Leads illegal telemarketing by signing up clients and charging them for their services, even though those policies were generated through illegal telemarketing.

77. Pandora Marketing either knew, or reasonably should have known, that Jared's Leads was violating the TCPA on its behalf and failed to take effective steps within its power to force the telemarketer to cease that conduct. Any reasonable seller that accepts telemarketing call leads from lead generators would, and indeed must, investigate to ensure that those calls were made in compliance with TCPA rules and regulations.

---

[1] *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd 6574, 6574 (¶ 1) (2013) ("May 2013 FCC Ruling").

78. Furthermore, after receiving a written letter from Ms. Jenkins identifying Defendants' wrongdoing, she received another autodialed telephone call from Jared's Leads.

79. Pandora Marketing also provided instructions on which numbers Jared's Leads should call.

80. Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-593 (¶ 46). Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

## CLASS ACTION ALLEGATIONS

81. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

82. Plaintiff brings this action on behalf of herself and the following classes (the "Classes") pursuant to Federal Rule of Civil Procedure 23.

83. Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> **Jared's Leads Robodialing Class:** All persons in the United States who, within four years prior to the commencement of this litigation until the class is certified, received one or more autodialed calls on their cellular telephone from or on behalf of Jared's Leads, sent via the same, or substantially similar, system used to contact the Plaintiff.
>
> **Jared's Leads National Do Not Call Registry Class**: All persons in the United States whose telephone numbers were on the National Do Not Call Registry for more than 30 days, but who received more than one telephone solicitation

telemarketing call from or on behalf of Jared's Leads with a 12-month period, from four years prior the filing of the Complaint.

**Pandora Marketing Robodialing Class:** All persons in the United States who, within four years prior to the commencement of this litigation until the class is certified, received one or more autodialed calls on their cellular telephone from or on behalf of Pandora Marketing, sent via the same, or substantially similar, system used to contact the Plaintiff.

**Pandora Marketing National Do Not Call Registry Class**: All persons in the United States whose telephone numbers were on the National Do Not Call Registry for more than 30 days, but who received more than one telephone solicitation telemarketing call on behalf of Pandora Marketing within a 12-month period, from four years prior the filing of the Complaint.

84. The Plaintiff is a member of and will fairly and adequately represent and protect the interests of, these Classes as she has no interests that conflict with any of the class members.

85. Excluded from the Classes are counsel, the Defendants, and any entities in which the Defendants have a controlling interest, the Defendants' agents and employees, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

86. Plaintiff and all members of the Classes have been harmed by the acts of the Defendants, including, but not limited to, the invasion of their privacy, annoyance, waste of time, the use of their cell phone battery, and the intrusion on their cellular telephone that occupied it from receiving legitimate communications.

87. This Class Action Complaint seeks injunctive relief and money damages.

88. The Classes as defined above are identifiable through the dialer records maintained by Defendants, other phone records, and phone number databases.

89. Plaintiff does not know the exact number of members in the Classes, but Plaintiff and her counsel reasonably anticipates Class members number, at minimum, in the hundreds in each class.

90. The joinder of all Class members is impracticable due to the size and relatively modest value of each individual claim.

91. Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits.

92. There are well defined, nearly identical, questions of law and fact affecting all parties. The questions of law and fact, referred to above, involving the class claims predominate over questions which may affect individual Class members.

93. There are numerous questions of law and fact common to Plaintiff and to the proposed Classes, including but not limited to the following:

   (a) whether Defendants utilized an automatic telephone dialing system to send its to the members of the Robocall Class;

   (b) whether agents operating on behalf of Defendants utilized an automatic telephone dialing system in sending automated calls to members of the Robocall Class;

   (c) whether Defendants systematically made multiple telephone calls to members of the National Do Not Call Registry Class;

   (d) whether Defendants made calls to Plaintiff and members of the Classes without first obtaining prior express written consent to make the calls;

   (e) whether Defendants' conduct constitutes a violation of the TCPA; and

   (f) whether members of the Classes are entitled to treble damages based on the willfulness of Defendants' conduct.

94. Further, Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has no interests which are antagonistic to any member of the Classes.

95. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, and especially TCPA class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other members of the Classes and have the financial resources to do so.

96. Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of class members, which will be ascertainable from records maintained by Defendants and/or its agents.

97. The likelihood that individual members of the Classes will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

98. Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

### FIRST CAUSE OF ACTION
**Statutory Violations of the Telephone Consumer Protection Act
(47 U.S.C. 227, et seq.) on behalf of the Robocall Classes**

99. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

100. The Defendants violated the TCPA by sending, or causing to be sent via an agent, automated calls to the cellular telephones of Plaintiff and members of the Jared's Leads and Pandora Marketing Robocall Classes (collectively the "Robocall Classes") using an automated dialer without their prior express written consent.

101. As a result of the Defendants' violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and members of the Robocall Classes are entitled to an award of $500 in statutory damages for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

102. The Plaintiff and Robocall Class Members are entitled to an award of treble damages if their actions are found to have been knowing or willful.

103. Plaintiff and Robocall Class Members are also entitled to and do seek injunctive relief prohibiting the Defendants from advertising their goods or services, except for emergency purposes, using an ATDS or pre-recorded voice in the future.

**SECOND CAUSE OF ACTION**
**Violation of the Telephone Consumer Protection Act**
**(47 U.S.C. 227, et seq. and 47 C.F.R. §§ 64.1200(d))**
**on behalf of the National Do Not Call Registry Class**

104. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

105. The Defendants violated the TCPA and the Regulations by making, or having its agent make, two or more telemarketing automated calls within a 12-month period to Plaintiff and the members of the Jared's Leads and Pandora Marketing National Do Not Call Registry Classes (collectively the "National Do Not Call Registry Classes") while those persons' phone numbers were registered on the National Do Not Call Registry.

106. As a result of the Defendants' violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and National Do Not Call Registry Class Members are entitled to an award of up to $500 in statutory damages for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

107. Plaintiff and National Do Not Call Registry Class Members are also entitled to and do seek injunctive relief prohibiting the Defendants from advertising their goods or services,

except for emergency purposes, to any number on the National Do Not Call Registry in the future.

108. The Defendants' violations were knowing or willful.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, prays for the following relief:

A. Injunctive relief prohibiting Defendants from calling telephone numbers advertising their goods or services, except for emergency purposes, to any number on the National Do Not Call Registry or to any cellular telephone numbers using a prerecorded voice in the future;

B. As a result of the Defendants' violations of 47 U.S.C. § 227(b)(1), Plaintiff seeks for herself and each Robocall Class member up to treble damages, as provided by statute, of $1,500 for each and every violation of the TCPA;

C. As a result of the Defendants' willful and/or knowing violations of 47 C.F.R. § 64.1200(d), Plaintiff seeks for herself and each member of the National Do Not Call Registry Class up to treble damages, as provided by statute, of up to $1,500 for each and every violation of the TCPA;

D. An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Classes the Court deems appropriate, finding that Plaintiff is a proper representative of the Class, and appointing the lawyers and law firms representing Plaintiff as counsel for the Class;

E. Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff request a jury trial as to all claims of the complaint so triable.

Dated: August 25, 2020

PLAINTIFF, on behalf of herself and others similarly situated,

DAVE MAXFIELD, ATTORNEY, LLC
/*s/ Dave Maxfield*_____
David A. Maxfield, Fed. ID 6293
P.O. Box 11865
Columbia, SC 29211
803-509-6800
855-299-1656 (fax)
dave@consumerlawsc.com

Anthony Paronich
Email: anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Telephone: (617) 485-0018
Facsimile: (508) 318-8100

KARL S. GWALTNEY
N.C. State Bar No. 45118
4801 Glenwood Avenue, Suite 310
Raleigh, North Carolina 27612
Telephone:    919.526.0450
Fax:             919.882.8763
kgwaltney@maginnislaw.com

*Attorneys for Plaintiff*